JUSTIN D. HEIDEMAN (USB # 8879)
CHRISTIAN D. AUSTIN (USB #9121)
JUSTIN R. ELSWICK (USB #9153)
**HEIDEMAN & ASSOCIATES**
2696 North University Avenue, Suite 180
Provo, Utah 84604
Telephone: (801) 472-7742
Facsimile: (801) 374-1724
Email: jheideman@heidlaw.com
        caustin@heidlaw.com
        jelswick@heidlaw.com

*Attorneys for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT
## STATE OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| BRODY CHEMICAL, INC., a Utah corporation,<br><br>Plaintiff,<br><br>vs.<br><br>GREGORY BUTLER, an individual; SHAUNA BUTLER, an individual; TROY BUTLER, an individual; ADVANCED TECHNOLOGY PRODUCTS, INC, a Montana corporation; ADVANCED TECHNOLOGY PRODUCTS, a Montana assumed business name; T&T DISTRIBUTING, INC., d/b/a DYPEX, a North Dakota corporation,<br><br>Defendants. | **COMPLAINT AND JURY DEMAND**<br><br><br>Case No. 2:15-cv-00908-DB<br><br>Judge: Dee Benson |

Plaintiff Brody Chemical, Inc. (**"BCI"**), by and through its undersigned counsel, hereby

complains and alleges against Defendants Gregory Butler, Shauna Butler, Troy Butler, Advanced

Technology Products, Inc., a/b/n Advanced Technology Products, and T&T Distributing, Inc., d/b/a Dypex, as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff BCI is a duly organized Utah corporation with its principal place of business in Salt Lake City, Utah.

2.      Defendant Gregory Butler is an individual who, on information and belief, resides in Bozeman, Montana.

3.      Defendant Troy Butler is an individual who, on information and belief, resides in Bozeman, Montana.

4.      Defendant Shauna Butler is an individual who, on information and belief, resides in Bozeman, Montana.

5.      Defendant Advanced Technology Products, Inc. is a corporation organized under the laws of the state of Montana, with its principal place of business in Bozeman, Montana.

6.      Defendant Advanced Technology Products is an entity doing business under an assumed business name registered with the state of Montana, with its principal place of business in Bozeman, Montana.

7.      This court has original jurisdiction pursuant to 28 U.S.C. § 1332, inasmuch as complete diversity of citizenship exists between Plaintiff and Defendants, and the amount in controversy exceeds $75,000.

8.      This Court has personal jurisdiction over Defendants in that a substantial portion of the facts and circumstances giving rise to this action occurred in the State of Utah, are related to breach of a contract entered into in the State of Utah and was to be performed in the State of Utah, and/or the actions of Defendants giving rise to this action occurred in Utah and/or were

directed at a resident of the State of Utah.

9.       Venue is proper in this court pursuant to 28 U.S.C. § 1391(b).

## STATEMENT OF RELEVANT FACTS

1.       Plaintiff Brody Chemical, Inc. is a Utah Corporation established by Jon Liddiard that began operation on July 1, 1991.

2.       BCI formulates, manufactures, and markets a complete line of sanitation, institutional, industrial, and maintenance chemicals for professional use.

3.       BCI manufactures over 600 different quality products, including automotive, floor care, grounds, car washing, industrial, institutional, laundry, insecticides, pool and spa products, and restaurant and food services products.

4.       BCI's products were conceived, formulated, and refined over time by former President and CEO, and currently Chairman of the Board, Jon Liddiard, who holds a degree in chemistry from the University of Utah.

5.       BCI's proprietary product formulas are closely guarded, and keeping them confidential is critical in preserving its business operations and differentiating itself in the market for such products.

6.       During over 24 years of operation, BCI has used its business acumen, resources, and judgment to identify suitable markets and industries, and design, formulate, and manufacture chemical products specific to those markets and industries.

7.       A critical component of BCI's business is marketing and selling the proprietary products it manufactures to customers, and BCI has expended tremendous time, effort, and resources in the pursuit of developing and maintaining its customer base.

8.       As part of its marketing and sales efforts, in August of 1991, BCI hired Gregory

("**Buzz**") Butler as a sales agent, and subsequently promoted him to General Sales Manager and appointed him to the Board of Directors. On January 24, 2012, BCI appointed Buzz as Vice President of the company.

9.      On January 20, 1994 Buzz executed an employment agreement, which included nondisclosure and noncompetition provisions. *See* Gregory Butler employment agreement, attached hereto as **Exhibit 1.**

10.      In part, Buzz's employment agreement provided that:

> **4.      CONFIDENTIAL INFORMATION:** The Sales Representative shall not at any time, either during the life of this Agreement or after termination thereof, divulge to others or use for his own benefit any confidential information and/or trade secrets obtained during the course of his or her relationship with the company relating to sales, formulas, processes, methods, machines, manufacturers, compositions, ideas, improvements, and inventions belonging to or relating to the affairs of the Company, or its affiliated, associated or successor companies.

> **5.      DAMAGES AND INJUNCTION:** It is expressly understood that because of the trouble and expenses that the Company and its affiliated and associated companies have gone to in creating, developing, establishing, and maintaining (a) valuable and extensive trade of its products; (b) its business connections and customers; (c) secret and confidential information pertaining to such business, including without limitation, sales volume and strategy, number and locations of Sales Representatives, names and lists of company's customers and clientele which by virtue of Representative's employment he will become personally acquainted within the assigned territory and (d) various formulas, processes confidential information (No. 4 above) of this Agreement will cause irreparable loss to the Company. Representative and Company therefore agree that the Company may, in addition to and not in lieu of any other remedy now or hereafter existing at law or in equity, enforce the covenants and agreements contained in this Agreement by way of injunctive relief in any court of competent jurisdiction.

*See* Employee Agreement.

11.      Buzz's Employment Agreement further documented that he was provided with copies of BCI's "Product Information Text Books, Product Labels, Price Lists, Order Pad, Brody

Training Manual, Daytimer/Planner, [and] Brody MSDS Book." *Id.*

12.     Defendant Troy Butler began employment with BCI on as a Sales Representative on or about February 20, 2011.

13.     In connection with his employment, Troy executed a Sales Representative Agreement on February 20, 2011, which expressly required Troy to protect the confidentiality of BCI's confidential information, both during his employment and following termination. *See* Troy Butler Sales Representative Agreement, attached hereto as **Exhibit 2.**

14.     As General Sales Manager and Vice President, Buzz was integrally involved in marketing and sales efforts and strategies, and responsible for interacting with, supervising, and managing BCI's sales force and customer relationships.

15.     As General Sales Manager, Vice President, and a member of the Board of Directors, Buzz had access to virtually all of the sensitive, confidential, and proprietary information that was critical to BCI's manufacturing and sales business.

16.     This included access to confidential information regarding BCI's product formulas, raw material suppliers, acquisition and manufacturing costs, price lists, customer lists, marketing plans and strategies, website materials, product names, product information (including MSDS sheets), employee personal files, employee requirements and relationships, and contact information for suppliers, customers, and employees.

17.     During his employment with BCI, Buzz developed a close personal relationship with then-President and CEO Jon Liddiard, and pursuant to his fiduciary position, was entrusted with BCI's trade secrets and confidential information, implementing BCI's sales and marketing strategies, and working closely with employees and distributors to maintain and build BCI's sales and reputation.

18.     Unbeknownst to BCI, by the summer of 2011, while still employed as General Sales Manager and Vice President with a seat on the Board of Directors, Buzz, along with his son Troy Butler (also a BCI employee), had conceived and begun implementing a scheme and plan to conspire to steal virtually all of BCI's confidential information and trade secrets, including BCI's product formulas, customer lists, price lists, supplier lists, and marketing strategies, and recruit key employees in the furtherance of establishing a new, competing entity called Advanced Technology Products.

19.     In furtherance of this scheme and plan, on or about July 7, 2011, Buzz filed a Business Name Reservation with the Utah Division of Corporations for "Advanced  Technology Products" (**"ATP"**). *See* ATP Business Name Reservation filing dated July 6, 2011, attached hereto as **Exhibit 3.**

20.     On the same date, Buzz registered a DBA with the Utah Division of Corporations for ATP. *See* ATP DBA filing dated July 6, 2011, attached hereto as **Exhibit 4.**

21.     On October 27, 2011, Buzz additionally registered ATP as an "Assumed Business Name" or "ABN" in the state of Montana.  *See* ATP ABN filing dated October 27, 2011.

22.     On February 1, 2013, Buzz filed ATP as a Montana corporation. *See* ATP Montana incorporation filing, dated March 11, 2013, attached hereto as **Exhibit 5.**

23.     In furtherance of his conspiracy with his father Buzz, on July 22, 2015 Troy Butler registered T&T Distributing, Inc., d/b/a Dypex, as a corporation in the state of North Dakota. *See* T&T incorporation filing dated July 22, 2015, attached hereto as **Exhibit 6.**

24.     BCI's former President and CEO, Jon Liddiard, who was also BCI's chief chemist, always kept a binder containing a complete copy of all of BCI's product formulas in his office. This was the only printed copy of BCI's product formulas. Jon used this copy of BCI's

formulas often to create, improve, or refine BCI's product formulas.

25.     In or about July of 2012, Mr. Liddiard's formula binder disappeared from his private office with restricted access. When Jon realized that his formula binder was missing, he confronted Buzz and asked him if he had taken the binder. In response, Buzz denied taking the formula binder.

26.     On March 12, 2013, Buzz terminated his employment with BCI, via a letter of resignation addressed to Jon Liddiard, Brody Liddiard, and the management team.

27.     At or about the same time that Buzz resigned from BCI, several BCI employees also terminated their employment and began working for ATP.  These included sales representatives Troy Butler, Robert Burbank, Virginia Burbank, Leigh Foreman, and Crystal Denton.

28.     Given Buzz's resignation and the simultaneous resignation of multiple employees, BCI reasonably believed that Buzz had solicited these and other employees prior to his resignation, and in violation of his Employment Agreement and his fiduciary duties of loyalty and fidelity to BCI as a member of the Board of Directors.

29.     On March 13, 2013, counsel for BCI accordingly sent a letter to Buzz reminding him of his legal obligations to BCI, and demanding that he honor his fiduciary obligations, and cease recruiting BCI employees to his new, competing enterprise.

30.     Buzz responded through is counsel, asserting that he was not acting in contravention of his fiduciary duties, and that ATP was his spouse Shauna Butler's entity.

31.     Notwithstanding BCI's demand, over the following 3 months additional employees, including Gordon Yearly, Rhonda Ponder, Jack Medau, and Randy Robinson left BCI and began employment with ATP or became an independent distributor of ATP and/or its

business partners.

32.     In July of 2015, Buzz recruited BCI employee Mike Herndon to become an

independent distributor of ATP and/or its business partners.

33.     Due to his long relationship with Buzz, and his significant personal friendship

with Buzz, Jon Liddiard and BCI attempted to informally negotiate an agreement with Buzz

whereby he would refrain from soliciting any additional BCI employees to his new competing

enterprise and that BCI and ATP would not disparage each other. These negotiations broke

down, and no agreement was ever reached.

34.     Following Buzz's departure, BCI has received evidence that ATP had conspired

with a Utah corporation, Sky Blue Industries, Inc., to use BCI's misappropriated product

formulas and other confidential information to manufacture and market BCI's products in direct

competition with BCI.

35.     Indeed, whereas Sky Blue had previously manufactured and marketed a relatively

limited line of products, primarily car wash products, it began manufacturing and marketing

hundreds of new products directed to new industries and markets which were virtually identical

or actually identical to the products developed, manufactured, and marketed by BCI. *See* BCI

and ATP Product Sheets, attached hereto as **Exhibit 7.**

36.     Sky Blue and ATP did not even bother to rename many of the products, selling

them under the identical names as BCI.  Such products were formulated, refined, and developed

by BCI.

37.     Sky Blue additionally employed several of the former BCI employees who had

left BCI simultaneously with, or shortly after, Buzz terminated his employment.

38.     ATP additionally directly copied BCI's order forms and other documents created

by the company, and created MSDS forms based on those prepared by BCI for its products. *See* BCI and ATP Order Forms and MSDS forms, attached hereto as **Exhibit 8.**

39.     In addition to directly marketing and selling the new products misappropriated from BCI itself, Sky Blue also manufactured the same products for ATP, who also marketed and sold them.

40.     In addition to misappropriating BCI's proprietary chemical formulations and products, Buzz also used BCI's stolen customer lists to solicit BCI's existing customers and persuade them to purchase products from ATP/Sky Blue instead of BCI.

41.     Although, based on the foregoing, BCI suspected that Buzz had misappropriated BCI's trade secrets and confidential information and used them in conspiracy with Sky Blue and former BCI employees to manufacture and sell products in direct competition with BCI and to steal BCI's customers, BCI could not fully corroborate its suspicions or determine the full extent of Defendants' conspiracy until September 21, 2015 when BCI received a letter from former employee Robert ("Mike") Burbank.

42.     Mr. Burbank, who had terminated his employment BCI simultaneously with Buzz, informed BCI that:

> a.   Around Thanksgiving of 2012, Buzz, who was Mr. Burbank's sales manager and worked closely with him to develop and expand BCI sales in North Dakota, began telling Mr. Burbank that BCI "was in debt to the IRS for 2.19 million dollars and that because they were obligated to pay $39,000 per month in interest they were going to raise our costs to customers 20%."
>
> b.   That "because of this need for money, which would be catastrophic for a salesperson in North Dakota, at this time Buzz also informed me of several

other [BCI] salespeople that were extremely upset with these same circumstances and that some of these people were looking for employment elsewhere,"

c.   During December 2012 and January 2013, Buzz informed Mr. Butler that he was planning to start his own company called ATP and give BCI employees "a better option."

d.   One of BCI's key suppliers, IXL Premium Lubricants, was planning to revoke its distributorship agreement with BCI and award it to ATP, and that Buzz "had Mike Ashworth, owner of IXL, call me and confirm exactly that."

e.   Throughout the month of February 2013, Buzz arranged for BCI salespeople to leave BCI "for employment with Sky Blue, whereby he would coach them and help them navigate their departure" from BCI.

f.   For example, Buzz "told Sky Blue how to word the ad in the newspaper looking for experienced chemical salespeople, and then Buzz informed 'specific' [BCI] salespeople where, when, and how to answer the ad."

g.   When Mr. Burbank "asked Buzz why he was going to so much effort, he informed me he was getting an override from Sky Blue on each salesman's sales."

h.   Mr. Burbank "found out later in a conversation with Mike Ashworth of  IXL that Buzz, all along was getting a 3% override on all IXL Grease sales to [BCI], while employed with [BCI]."

i.   "Towards the end of February [2013], after hearing for the previous 3 months from Buzz about all the [BCI] issues and problems ad nauseam, he informed

my wife Virginia, Crystal Denton, her husband Dennis (our [BCI] warehouse manager in North Dakota), and myself that he was submitting his resignation" to BCI, and that "we, as salespeople, should tender ours as well, all of us together, at 9 a.m. March 11, 2013," which he chose "to insure us getting our [BCI] paychecks at 12:01 a.m., earlier that morning."

j.   "As part of his sales pitch to recruit us, Buzz assured each of us that he already had a warehouse filled with product, ready to go, in Glendive, [Montana] that would also have the 'exact same chemical formulas'" as BCI's, and that "as our [BCI] Sales Manager, he had all of our noncompete sales contracts in his possession."

k.   Mr. Burbank "personally sat in [Buzz's] office in Bozeman, [Montana], whereby he took my [BCI] contract from a file cabinet and showed it to me."

l.   "Months later, I attended an ATP sales conference in Bozeman, [Montana], at that conference Buzz had a guest speaker, whom he introduced as Steve, the owner of Sky Blue. Steve informed us that it was 'he,' and Sky Blue, that blended ATP Chemical's formulas, and when talking about ATP's formula for Super 90 Degreaser, Steve said to Buzz 'that formula you gave me for Super 90 was amazing."

m.   Mr. Burbank and other ATP and Sky Blue salespeople were provided a "script" to use when soliciting BCI customers and attempting to persuade them to move their business to ATP.  This script included informing the customer that BCI was going bankrupt and on the verge of going out of business, and that ATP would provide the exact same products BCI provided

at a lower cost.

n.  Using BCI's confidential information, ATP went to the same suppliers of the chemical components of BCI's products and obtained the same materials used by BCI to produce products based on BCI's formulas.

o.  ATP had Mr. Burbank execute an Employment Agreement that was identical to the Employment Agreement used by BCI, except that ATP was substituted for BCI.

*See* Letter from Robert Burbank, dated September 21, 2015, attached hereto as **Exhibit 9;** Declaration of Robert Burbank, attached hereto as **Exhibit 10.**

43.  Based on this alarming and deeply disturbing information from Mr. Burbank regarding the extent and scope of Buzz's conspiracy in breach of his fiduciary duties, defamation of BCI in order to steal its customers, theft of trade secrets, and theft of other confidential information and employee employment agreements, BCI thereafter reached out to current and former employees, customers, and suppliers in an effort to further corroborate Mr. Burbank's information.

44.  For example:

a.  BCI employee Collette Jacobson informed BCI that approximately two weeks before his resignation of March 11, 2013, Buzz requested a full customer list printout.  Buzz further had full access to BCI's computerized database containing every account, every contact, prices paid for product, addresses, phone numbers, and other information for every BCI account.

b.  Brad Reeves, an employee of BCI, reported to BCI that in soliciting him to work for his new business, Buzz told him that ATP's product called "Old

Yeller" was the same formula as BCI's Industrial Degreaser.

c.  Crystal Denton, a former BCI employee who terminated her employment simultaneously with Buzz, reported that at the time of Buzz's termination, in order to induce her to leave BCI, Buzz told her that BCI was going out of business, and that Buzz and his new entity, ATP, would have access to and use BCI's product formulas, customer lists, and other confidential information.

45.  In addition, BCI employee Terry Pollert informed BCI that:

a.  About January 2013 Buzz met with Jim Pollert and myself in Billings, Montana, at this meeting Buzz discussed the following with me.

   i.  Buzz informed me that he had started a new business called Advanced Technology Products (ATP).

   ii.  Buzz informed that he had all of Brody Chemical's vendors, suppliers and product formulas to start his new business.

   iii.  Buzz informed he had an agreement in place with Steve Griffin from Sky Blue Industries to manufacture the products using Brody Chemicals formulas.

   iv.  Buzz had started to recruit the Brody Chemical sales representatives from Utah, Wyoming, Montana and Brad Reeves, the reason for these areas was that the Buzz had a personal relationship with these representatives and did not know the other representatives with Brody Chemical that well.

   v.  Buzz stated that any representatives that he recruited to work for Sky

Blue Industries that he would receive an override commission from Sky Blue, the sales people of Randy Robinson and Ronda Ponder.

vi.   I was instructed by Buzz not to sign the new paperwork with Solution Services Payroll on behalf of Brody Chemical due to non-compete that they were asking me to sign.

vii.   Buzz informed me that one of the reasons he started his own company was that Brody Chemical did not want to continue to distribute IXL products, which he had helped develop that line of products for Brody Chemical.

viii.   Buzz informed me that he Brody Chemical would be out of business within six months of this meeting.

ix.   Buzz informed me that he would have better pricing to the customers than Brody Chemical. Also he would pay higher commissions than Brody Chemical.

x.   Buzz presented me with a box business cards from ATP with my name on them, I asked why he made these cards. Buzz said that he was making the assumption that I would want to come work for him and his company ATP.

xi.   Buzz asked me to keep in touch, and specifically asked me not to tell anyone at Brody Chemical about this meeting, that Buzz was starting ATP and planning on leaving Brody Chemical. Since Buzz was still employed at the time with Brody Chemical and they do not know his plans.

     b.   In about June of 2013 I started to sell a few products for ATP, at this time I noticed that the all the paperwork, product descriptions, formulas where the same as Brody Chemicals.

     c.   Buss stated to me that he used the paperwork from Brody Chemical and changed it to say ATP.

     d.   In October of 2013 Buzz stated to me that I had to leave Brody Chemical and work for him exclusively. If I did not exclusively go to work for Buzz and ATP. Buzz stated to me that he before he left Brody Chemical that he had a printout of all the accounts from Brody Chemical. That he would contact my accounts and take them to ATP without me being involved and I would lose all that business.

     e.   I was assigned an area to follow up on accounts by a former Brody Chemical sales representative named Mike Herndon that now had gone to work for ATP. In talking with some of the accounts I learned that Mike Herndon and ATP where communicating to the customers that ATP was a division of Brody Chemical and they were still ordering and receiving product from Brody Chemical, just with the new division name of ATP on them.

Declaration of Terry Pollert, attached hereto as **Exhibit 11**; Declaration of Jim Pollert, attached hereto as **Exhibit 12**.

     46.   Further, in a conversation with Mike Ashworth of supplier IXL on October 1, 2015, BCI was informed that:

     a.   Two and a half years earlier Buzz came to IXL and said BCI was going out of business in 6 months, that President and CEO Jon Liddiard had a class action

lawsuit against him which was going to destroy BCI, that Buzz and Troy were leaving BCI and the only way to save IXL's business in North Dakota was to leave with them.

b.   Buzz was not the only conspirator, and that Troy Butler was equally involved in the effort to persuade IXL to terminate its distributorship agreement with BCI and do business with ATP once formed.

c.   Buzz and Troy repeatedly stated that BCI was going out of business, was deeply in debt, was in receivership, planned to terminate its relationship with IXL and purchase from another supplier, and because BCI was 60% of IXL's business, they had no choice but to move their business to ATP.

d.   In order to further persuade IXL to move its business to ATP, Buzz and Troy falsely represented that 90% of the product supplied by IXL was sold by Troy in North Dakota, and that if he left BCI, BCI would dramatically reduce their orders from IXL.

e.   At a meeting between Mr. Ashworth, Buzz, and Steve Griffin, the owner of Sky Blue, Buzz provided all of BCI's chemical formulas to Sky Blue, and represented that they were in fact owned by him.

f.   In response to questions about the legality of Buzz's formation of ATP, use of BCI's chemical formulas, and solicitation of IXL's business, all while still employed by BCI, Buzz represented that he did not have a non-competition agreement with BCI, and that even though he had been conspiring for months prior to terminating his employment to steal BCI's trade secrets, employees, and customers, IXL had no choice but to move their business to ATP because

BCI was definitely going out of business due to lawsuits and tax debts, and other internal problems.

g.  Buzz repeatedly assured Mr. Ashworth that even if his actions were illegal, BCI would never sue him because of his personal relationship with Jon Liddiard.

h.  While still employed with BCI, and negotiating a supply agreement with IXL on behalf of BCI, Buzz negotiated a secret side agreement with IXL whereby Buzz was personally paid an override of 5% on all materials sold to BCI.

*See* Declaration of Jon Liddiard, attached hereto as **Exhibit 13.**

47.    BCI additionally contacted several other former and current customers and suppliers, who have informed BCI that Buzz, Troy, ATP and/or their agents solicited their business, represented to them that BCI was going bankrupt and going out of business, and that ATP and/or Sky Blue would be their only option to continue to supply or purchase the products they had been buying from BCI.

48.    BCI additionally conducted a review of its employee files, and discovered that, indeed, the hard copy of several employees' employment agreements, including those that had terminated employment with BCI and gone to work for ATP and/or Sky Blue, had been removed from their employee file.

49.    Defendants have and continue to wrongfully and willfully use BCI's misappropriated trade secrets and confidential information including BCI's product formulations that are critical to its business, to solicit BCI's suppliers and customers, and to defame BCI, all in an effort and conspiracy to steal its business, which conduct has and continues to inflict ongoing, irreparable harm to BCI's business and reputation.

## FIRST CAUSE OF ACTION
### Breach of Fiduciary Duty
### (against Gregory "Buzz" Butler)

50.      BCI incorporates the allegations of the preceding and succeeding paragraphs as if fully set forth herein.

51.      Commensurate with his position at BCI, as an acting board member of BCI, as General Sales Manager and Vice President responsible for BCI's daily business operations regarding sales, marketing, customer relations, strategy, and supervision of sales staff, BCI placed trust and confidence in Buzz as its agent, director, officer, and employee.

52.      By virtue of his positions at BCI, Buzz owed BCI certain fiduciary duties, including but not limited to:

      a.   A duty of loyalty;

      b.   A duty to act with care and in good faith and in the best interests of the company at all times;

      c.   A duty not to enter into self-dealing transactions that harm the company;

      d.   A duty not to usurp corporate opportunities of the company;

      e.   A duty of candor, fair dealing, and honesty;

      f.   An obligation to disclose all material facts to the company.

53.      Buzz has breached his fiduciary duties by virtue of the conduct alleged herein, including by using BCI's resources, contacts, information, trade secrets, business relationships and corporate opportunities, for his own personal benefit and of the other Defendants.

54.      Buzz's breach of his fiduciary duties has actually and proximately caused harm to BCI in an amount to be proven at trial.

55.      BCI is further entitled to recover all direct and consequential damages

proximately caused by Buzz's breach of his fiduciary duties.

56.     BCI is further entitled to all other actual and equitable relief to which it may be entitled under law, including recovery of its attorney fees and costs herein.

57.     Because Buzz's breaches of his fiduciary duties were willful, wanton, intentional, and were undertaken with reckless indifference to those duties and to the rights of BCI, BCI is further entitled to an award of exemplary and/or punitive damages against Buzz in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### Usurpation of Corporate Opportunity
### (against Gregory "Buzz" Butler)

58.     BCI incorporates the allegations of the preceding and succeeding paragraphs as if fully set forth herein.

59.     As alleged herein, Buzz, by virtue of his positions with BCI, owed fiduciary duties to BCI, including the duty to maintain all corporate opportunities for the benefit of the company, to offer any such opportunities known to Buzz to the company rather than appropriating them for himself, and not to personally benefit from such opportunities at the expense of the company.

60.     In violation of his fiduciary duties to BCI, Buzz failed to maintain all corporate opportunities known to him for the benefit of BCI, including but not limited to profits from purchases from supplier IXL and sales of product to other entities and, on information and belief, other purchases and corporate opportunities that Buzz diverted from BCI (the **"Corporate Opportunities"**).

61.     BCI, as the rightful owner of the Corporate Opportunities, is entitled to recover from Buzz all profits, improvements, or additional funds or revenue generated or received by

Buzz or the other Defendants in connection with the Corporate Opportunities.

62.     BCI is further entitled to recover all damages proximately caused by Buzz's usurpation of the Corporate Opportunities, an amount to be proven at trial.

63.     Because Buzz's usurpation of the Corporate Opportunities was willful, wanton, intentional, and undertaken with reckless indifference to those duties and to the rights of BCI, BCI is further entitled to an award of exemplary and/or punitive damages against Buzz in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**Unjust Enrichment**
**(against all Defendants)**

64.     BCI incorporates the allegations of the preceding and succeeding paragraphs as if fully set forth herein.

65.     In the event that any of the other legal remedies asserted herein are insufficient to make BCI whole, thereby leaving BCI without any adequate remedy at law, BCI hereby pleads in the alternative.

66.     As set forth above, Defendants all received confidential information, trade secrets, funds, the Corporate Opportunities, and/or other property, respectively, in a manner that unfairly benefitted Defendants to the detriment of BCI.

67.     The Defendants appreciated or had knowledge of the benefit and enrichment that was improperly conferred upon each of them, respectively.

68.     The Defendants have accepted and retained the benefit and enrichment under such circumstances as would make it inequitable for them to do so without payment of the value of such equipment, funds, and other property.

69.     The Defendants are, therefore, liable to BCI for the amount they have been

unjustly enriched; BCI is further entitled to disgorgement in the amount of the Defendants'

unjust enrichment, in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
**Conversion**
**(Against all Defendants)**

70.     BCI incorporates the allegations of the preceding and succeeding paragraphs as if

fully set forth herein.

71.     As set forth above, certain funds, intellectual property, confidential information,

trade secrets, and/or other property were paid for and/or provided to Defendants, which properly

belonged to BCI.

72.     The respective conduct of Defendants, as described above, was willful and

constitutes a wrongful and deliberate interference with BCI's immediate possession and

ownership of its property and/or the exercise of dominion over BCI property without claim of

right or title to such property that is inconsistent with BCI's rightful ownership.

73.     BCI is entitled to immediate disgorgement and return of all amounts and property

wrongfully converted by Defendants respectively.

74.     BCI has been damaged as a direct result of the conversion of BCI's property by

Defendants. Accordingly, BCI is entitled to recover its general, compensatory, and actual

damages, all in amounts to be determined at trial.

### FIFTH CAUSE OF ACTION
**Computer Fraud and Abuse**
**(Against Gregory "Buzz" Butler and ATP, Inc.)**

75.     BCI incorporates the allegations of the preceding and succeeding paragraphs as if

fully set forth herein.

76.     BCI's company computers and database are "protected computers" within the

meaning of 18 U.S.C. § 1030(e) and is used by BCI in interstate commerce.

77.     On information and belief, Buzz knowingly accessed BCI's computers to obtain information of value, including but not limited to BCI's confidential and proprietary information and trade secrets.

78.     On information and belief, at the time Buzz accessed BCI's computers on behalf of himself and ATP, Buzz was acting in furtherance of a plan, conspiracy, and scheme to misappropriate BCI's confidential and proprietary information on behalf of himself, ATP, and its co-conspirators, both before and after he terminated his employment, and was not authorized to access BCI's computers for such purpose.

79.     The access of BCI's computers and misappropriation of BCI's confidential and proprietary business information caused BCI damages in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**
**Intentional Interference with Economic Relations**
**(Against all Defendants)**

80.     BCI incorporates the allegations of the preceding and succeeding paragraphs as if fully set forth herein.

81.     Defendants had actual knowledge that BCI has existing contractual and commercial relations with BCI's business partners including suppliers, customers, and potential customers.

82.     Defendants have also made false and disparaging statements to BCI's suppliers and customers concerning BCI, including that BCI was insolvent, was or was about to go into bankruptcy, and that Defendants would be the only entity able to provide or purchase materials and products to and from BCI's suppliers and customers.

83.     Defendants' interference was, as set forth in the preceding and succeeding

paragraphs herein, accomplished by improper means.

84.     Defendants' misrepresentations have caused injury and will continue to cause injury to BCI, in an amount to be proven at trial.

85.     The intentional interference with BCI's contractual and commercial relationships by Defendants manifests a knowing and reckless indifference toward, and a disregard of, the rights of BCI. Accordingly, BCI is entitled to exemplary damages in an amount equaling twice the award of damages for actual loss and unjust enrichment.

**SEVENTH CAUSE OF ACTION**
**Civil Conspiracy**
**(Against all Defendants)**

86.     BCI incorporates the allegations of the preceding and succeeding paragraphs as if fully set forth herein.

87.     On information and belief, Defendants Buzz, Troy, and Shauna, acting through Defendant ATP (collectively, the **"ATP Conspirators"**), have intentionally and knowingly agreed and conspired together, in combination of two or more persons, on an object to be accomplished: namely, to misappropriate BCI's confidential information and intellectual property to compete against BCI.

88.     On information and belief, in pursuing this object, the ATP Conspirators have engaged in several overt, unlawful actions, including but not limited to misappropriating BCI's confidential and proprietary information including supplier lists, customer lists, cost lists, and product formulas without BCI's consent, and falsely representing to BCI's business partners, suppliers, and customers that BCI was insolvent, was on the verge of financial collapse, and/or that BCI was out of business or would be out of business imminently.

89.     The ATP Conspirators' wrongful and unlawful conduct was pursuant to, and in

furtherance of, that agreement and/or furthered by the conspiracy by conceiving, encouraging, ratifying, or adopting the conduct of the other.

90.     As a direct and proximate result of the conduct in furtherance of the conspiracy, BCI has suffered injury, damage, loss, and harm in an amount to be proven at trial.

91.     On information and belief, the ATP Conspirators' wrongful acts were willful, malicious, oppressive, and in conscious disregard of BCI's rights. BCI is therefore entitled to an award of punitive damages to deter future wrongful conduct by the ATP Conspirators.

**EIGHTH CAUSE OF ACTION**
**Utah Trade Secrets Act**
**(Against Gregory "Buzz" Butler and Troy Butler)**

92.     BCI incorporates the allegations of the preceding and succeeding paragraphs as if fully set forth herein.

93.     BCI's product formulas, supplier lists, supply costs, customer lists, financial statements, customer leads, payroll information, employee files, passwords, banking information, price sheets, product quotes, sales records, accounting documents, marketing plans and tools, and current and future projects (collectively, the **"Trade Secrets"**) are trade secrets, and contain information with actual and potential economic value which is not generally known to or ascertainable by others who might obtain economic value from that information's disclosure or use.

94.     BCI takes reasonable measures to protect the secrecy of its trade secrets, including storing them in a secure accounting system and database on a secure server, which are only accessible by password-protected company electronic devices, and limiting dissemination of information to only those with proper related position and duties. BCI further requires its employees to execute nondisclosure agreements as a condition of employment. Defendants, who

owed fiduciary duties and/or duties of loyalty to BCI, misappropriated BCI's product formulas manual and BCI's other Trade Secrets.

95.     Buzz and Troy, by virtue of their relationship and positions with BCI, had access to and/or knowledge of the Trade Secrets.

96.     Buzz and Troy acquired access and/or knowledge of the Trade Secrets under circumstances giving rise to a duty to maintain the secrecy of the Trade Secrets and/or limit their use. Defendants further entered into a contractual agreement to protect and maintain the confidential and proprietary nature of the Trade Secrets.

**NINTH CAUSE OF ACTION**
**Declaratory Relief**
**(Against all Defendants)**

88.     BCI incorporates the allegations of the preceding and succeeding paragraphs as if fully set forth herein.

89.     As described more fully above, Defendants are currently using BCI's proprietary and confidential information in an effort to produce and market chemical products in direct competition with BCI.

90.     By reason of the facts alleged herein, BCI is entitled to declaratory relief against Defendants barring Defendants from using BCI's confidential and proprietary information or disseminating it to others, including BCI's product formulas, supplier lists, supply costs, customer lists, financial statements, customer leads, payroll information, employee files, passwords, banking information, price sheets, product quotes, sales records, accounting documents, marketing plans and tools, and current and future projects.

91.     Defendants should further be barred from soliciting any BCI supplier, customer, or distributor and from making false representations about BCI, or disclosing any information

regarding BCI's management, financial condition, practices, procedures, or business relationships.

### TENTH CAUSE OF ACTION
**Defamation**
**(Against Gregory "Buzz" Butler and Troy Butler)**

92.     BCI incorporates the allegations of the preceding and succeeding paragraphs as if fully set forth herein.

93.     As described above, on information and belief, Buzz and Troy and/or their agents have made false and disparaging statements about BCI, its business, its financial condition, and its management, to others including current and former BCI employees, and BCI's business partners including suppliers, distributors, and customers.

94.     The false statements include statements to the effect that BCI was in financial trouble, was about to or had gone out of business, that BCI was not properly managed, that BCI had or would imminently enter bankruptcy and that BCI was subject to lawsuits or IRS tax obligations that would put it out of business.

95.     The false statements were known by Defendants to be false, or made with reckless disregard for their truth or falsity, and were made by Defendants with actual malice, with the intent of damaging BCI's business, misappropriating its business partners and misappropriating its customers and employees.

96.     The false statements made by Defendants constitute defamation per se, in that they were, by their nature, of a character that would presumably, and actually have, caused BCI pecuniary loss.

97.     Because Defendants' conduct was willful, wanton, intentional, and undertaken with actual malice and with reckless disregard for their truth or falsity, BCI is further entitled to

an award of exemplary and/or punitive damages against Defendants in an amount to be determined at trial.

### ELEVENTH CAUSE OF ACTION
**Injunctive Relief**
**(Against all Defendants)**

98.     BCI incorporates the allegations of the preceding and succeeding paragraphs as if fully set forth herein.

99.     As described more fully above, Defendants have defamed BCI and misappropriated BCI's confidential and proprietary information and Trade Secrets, and wrongfully used the misappropriated information in order to steal BCI's customers and employees, exploit BCI's business relationships, manufacture BCI's products, and engage in direct competition with BCI.

100.     As a result of Defendants' actions, BCI has suffered and is continuing to suffer irreparable harm.

101.     Therefore, by reason of the facts alleged herein, BCI is entitled to temporary, preliminary, and permanent injunctive relief.

### TWELFTH CAUSE OF ACTION
**Constructive Trust**
**(Against all Defendants)**

102.     BCI incorporates the allegations of the preceding and succeeding paragraphs as if fully set forth herein.

103.     As alleged herein, Defendants have wrongfully received and retained, respectively, BCI monies and property for their own pecuniary gain.

104.     BCI is the rightful owner of all BCI monies and property received by Defendants, and to all benefits, profits, and revenue received by Defendants as a result thereof.

105.     Based on the facts alleged herein, it would be unjust and inequitable, and it would result in Defendants being unjustly enriched if they were allowed to retain these monies or benefits for their own benefit and use.

106.     Equity requires this Court to (a) order and declare that Defendants are respectively holding the funds, property, or benefits of BCI in constructive trust for the benefit of BCI, and (b) order that Defendants respectively return and convey to BCI all of its funds, property, and/or benefits.

**THIRTEENTH CAUSE OF ACTION**
**Breach of Contract**
**(Against Gregory "Buzz" Butler)**

107.     BCI incorporates the allegations of the preceding and succeeding paragraphs as if fully set forth herein.

108.     As set forth more fully above, at the time he was hired by BCI, Buzz executed an Employment Agreement.

109.     The Employment Agreement constitutes a binding contract between the parties.

110.     BCI fully fulfilled and performed its obligations under the Employment Agreement.

111.     Buzz breached the Employment Agreement by, among other things, misappropriating BCI's confidential information and disseminating that information to others, and by using the misappropriated confidential information to form and operate a competing enterprise.

112.     Buzz's breach of the Employment Agreement has and will continue to cause BCI to incur damages in an amount to be established at trial, but in any event not less than $5,000,000.

## FOURTEENTH CAUSE OF ACTION
### Breach of Contract
### (Against Troy Butler)

88.     BCI incorporates the allegations of the preceding and succeeding paragraphs as if fully set forth herein.

89.     As set forth more fully above, as a condition of his employment with BCI, Troy executed an Employment Agreement.

90.     The Employment Agreement constitutes a binding contract between the parties.

91.     BCI fully fulfilled and performed its obligations under the Employment Agreement.

92.     Troy breached the Employment Agreement by, among other things, misappropriating BCI's confidential information and disseminating that information to others, and by using the misappropriated confidential information to form and operate a competing enterprise.

93.     Troy's breach of the Employment Agreement has and will continue to cause BCI to incur damages in an amount to be established at trial.

## PRAYER FOR RELIEF

WHEREFORE, BCI prays for entry of judgment against Defendants as follows:

A.     For general and specific damages in an amount to be proven at trial;

B.     For compensatory damages to be proven at trial;

C.     For punitive and exemplary damages to be proven at trial;

D.     For a temporary, preliminary, and permanent injunction against Defendants as alleged herein or as the Court deems appropriate;

E.     For a finding that Defendants are jointly and severally liable for conspiring

against BCI;

      F.      For the other specified relief alleged herein;

      G.      For attorneys' fees and costs incurred in bringing this action; and

      H.      For such other relief as this Court deems reasonable and just.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, BCI demands a trial by jury of any issues triable by a jury.

DATED and SIGNED on this 29th day of December, 2015

**HEIDEMAN & ASSOCIATES**

*/s/ Christian D. Austin*
Christian D. Austin
*Attorney for Plaintiff Brody Chemical, Inc.*